# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

PAIGE HUNT and
COLLEEN SMITH,

    Plaintiffs,

    v.

CONSTANTINE COMMERCIAL
CONSTRUCTION,
MICHAEL CONSTANTINE and
DIANA PARSONS,

    Defendants.

Civil Action No. TDC-20-1846

## MEMORANDUM OPINION

Plaintiffs Paige Hunt and Colleen Smith have filed this civil action against Defendants Constantine Commercial Construction ("CCC"), Michael Constantine, and Diana Parsons, alleging that they did not receive overtime pay to which they were entitled, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219 (2018), the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Labor & Empl. §§ 3–401–417 (West 2017), and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Labor & Empl. § 3–502. They also allege employment discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018). The parties have filed Cross Motions for Summary Judgment, which are fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. See D. Md. Local R. 105.6. For the reasons set forth below, Plaintiffs' Motion will be DENIED, and Defendants' Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Defendant CCC is a commercial construction company owned and managed by Defendant Michael Constantine, the President of CCC. Diana Parsons is the Chief Financial Officer ("CFO") and Director of Administration of CCC. Plaintiff Paige Hunt began working at CCC as an administrative assistant in March 2014. Plaintiff Colleen Smith began working at CCC as an administrative assistant in September 2017. Plaintiffs' responsibilities included answering the telephone, receiving mail and packages, greeting visitors, filing documents, assisting with purchase orders, "submittals," certificates of insurance, and requests for information, and more generally providing administrative support. Hunt Dep. at 52–53, Defs.' Mot. Summ. J. Ex. 2, ECF No. 34-2; Smith Dep. at 10–11, Defs.' Mot. Summ. J. Ex 3, ECF No. 34-3. Plaintiffs were hired by, and directly supervised by Parsons. Parsons also determined their pay rates, in consultation with Michael Constantine.

### I. Overtime Claims

CCC's operating hours are 8:00 a.m. to 5:00 p.m., Monday through Friday. During their employment at CCC, Plaintiffs' scheduled work hours mirrored CCC's operating hours. Plaintiffs, however, assert that they often arrived at work earlier than 8:00 a.m. and stayed at work later than 5:00 p.m. to complete various work-related tasks.

According to Hunt, she arrived early or stayed late "almost . . . every single day." Hunt Dep. at 49–50. She asserts that she worked 51.5 hours per week on average. Specifically, Hunt asserts that she often arrived approximately 15 minutes before her 8:00 a.m. scheduled start time and stayed after 5:00 p.m., as late as 9:40 p.m. on a few occasions. Similarly, Smith asserts that she worked 47 hours per week on average. Specifically, Smith testified in her deposition that she often stayed between 30 minutes and several hours after 5:00 p.m. on multiple days per week.

Plaintiffs also had remote access to the company computer network and their company emails, which permitted them to work from outside of the office. In further support of their contention that they often worked later than 5:00 p.m., Plaintiffs have submitted photographs of both Plaintiffs taken at work after 5:00 p.m., including photographs of Hunt taken on different days between August 10, 2017 and November 20, 2018 at 5:01 p.m., 6:02 p.m., 5:58 p.m., 6:32 p.m., 6:35 p.m., 6:43 p.m., and 6:55 p.m., and a photograph of Smith taken at 6:55 p.m. on November 20, 2018. Plaintiffs have also submitted work-related emails sent after 5:00 p.m. on various days between February 20, 2018 and January 30, 2020, including emails sent by Hunt at 5:17 p.m., 5:29 p.m., 8:07 p.m., 8:43 p.m., 9:02 p.m., 9:03 p.m., and 9:15 p.m. and emails sent by Smith at 7:59 p.m., 8:00 p.m., 8:55 p.m., 9:27 p.m., 9:56 p.m., and 10:05 p.m.

By contrast, Parsons asserts that Plaintiffs never worked more than 40 hours per week. Parsons stated in her deposition that, although Hunt often stayed later than 5:00 p.m., on "98%" of those occasions, Hunt spent this time talking to co-workers about personal matters. Parsons Dep. at 23, Defs.' Mot. Summ. J. Ex. 4, ECF No. 34-4. Parsons further testified that when Hunt stayed later than 5:00 p.m. for work-related reasons, it was typically to make up time missed due to a late arrival.

Plaintiffs were permitted to take a one-hour lunch break at any time between 11:00 a.m. and 1:00 p.m. However, Plaintiffs maintain that they often worked during their lunch breaks. According to Plaintiffs, during their lunch breaks, they were required to answer the telephone, receive packages, submit drawings and building permits, and buzz visitors into the office. Hunt has testified in her deposition that Parsons instructed Plaintiffs that they were required to perform several of these responsibilities during their lunch break. As a result, when they ate lunch together, they put the phone between them so one could answer it if it rang.

Plaintiffs have acknowledged that they were not required to take their lunch break at a particular time and could have staggered their lunch breaks to avoid working during the break. As acknowledged by Parsons, however, she discouraged employees from eating at their desks, and the CCC staff usually ate lunch together as a team, with someone going to pick up lunch. Hunt understood that Michael Constantine and Parsons preferred that all employees eat lunch together in the conference room every day to promote team bonding.

While Plaintiffs worked at CCC, the company did not use timecards to track their work hours. Instead, Barb Adams, CCC's payroll clerk, kept a calendar on her desk and made handwritten notations to assist with preparing payroll. Adams used this calendar to track late arrivals and early departures, along with more formalized leave such as vacation or sick leave. However, Adams did not use this calendar or any record to track early arrivals, late departures, or missed lunch breaks. Parson also generally tracked employees' vacation time on her own calendar in her office.

Hunt's final rate of pay was $27.04 per hour. Smith's final rate of pay was $24 per hour. Neither Plaintiff was ever paid any overtime compensation.

## II.    Title VII Claims

Plaintiffs also assert that they were subjected to sex discrimination while employed at CCC, including disparate treatment as compared to male employees and a hostile work environment, as well as retaliation for reporting the sex discrimination.

According to Plaintiffs, they were treated less favorably than male employees at CCC in a variety of ways. First, Hunt testified that they were subjected to heightened discipline, including verbal reprimands for "minimally disruptive" conduct such as listening to music with headphones or humming to themselves during the workday. Hunt Dep. at 95-96. Hunt asserted that, by

4

contrast, male employees, including Mark Constantine, a CCC employee who temporarily worked in an administrative capacity, and David Westerlund, a project manner responsible for some administrative work, were not disciplined for disruptive workplace conduct, such as watching "loud Youtube videos," "setting loose live chickens in the office," setting off "confetti bombs," sabotaging work equipment, hiding co-workers' food, and damaging co-workers' clothing. *Id.* at 96–97.

Plaintiffs also assert that as female employees, they were subjected to heightened scrutiny over their arrival times in the morning. According to Hunt, she would receive a "public talking-to in front of the entire office" if she arrived late, *id.* at 104–05, while male employees often arrived to work late without reprimand. Hunt also asserted that the female employees were required to submit significant documentation in order to get approval for medical or vacation leave, which often was not granted until the last minute, while male employees were granted such leave with little or no notice and without the need for as much documentation.

Plaintiffs also claim disparate treatment based on the facts that they did not receive formal job titles and were not permitted to give a title in external communications, they were sometimes excluded from company lunch outings, and they were not included in the company photograph. Hunt testified that, by contrast, the male employees had formal titles they could use when communicating with clients and were included in the company photograph and lunch outings.

Plaintiffs have also asserted that they were "routinely" subjected to comments of a sexual nature. *Id.* at 93–94, 122. Specifically, Hunt has testified that Parsons regularly commented on the size of her breasts and the breasts of another female employee, particularly during time periods when they were breastfeeding. On one occasion, Parsons prodded Hunt in the stomach after she

5

returned from maternity leave, stating that Hunt was still "chubby." *Id.* at 26.  Parsons also regularly commented on Plaintiffs' clothing and suggested that it was "too revealing." *Id.* at 122.

Parsons also routinely made statements in a public way about her belief that certain female staff members were engaging in sexual relationships with male staff members at a particular time. For example, Parsons falsely stated that Hunt was having sexual relations with Franz Fearnley, another CCC employee.  Similarly, Michael Constantine told Hunt on multiple occasions that she needed to "watch out" for Fearnley, which Hunt understood to suggest that she was having an intimate relationship with him. *Id.* at 126.  Parsons also frequently made derogatory comments about victims of sexual abuse, such as stating that "women who dressed up were asking for it" and "got what they deserved." *Id.* at 128–30.  According to Hunt, on one such occasion, Parsons made such a comment during a company lunch about the way a victim of Bill Cosby had been dressed, and Smith became very upset and had to leave the room.

On multiple occasions, Plaintiffs complained of the disparate treatment and the sexual statements.   In one instance, Smith reported to Michael Constantine that the company's administrative assistants, who were all women, were treated unfavorably, specifically in relation to the fact that they were not allowed to use their titles when communicating with clients and were excluded from the company photograph.  Constantine acknowledged that these incidents could be seen as discriminatory.  When Hunt complained to Parsons about the disparate treatment, Parsons told her to "shut the fuck up and just do your work," and that "this is my company and I can do and say whatever I want." *Id.* at 111–12; Pls.' Answers to Interrogatories at 7–8, Pls.' Mot. Summ. J. Ex. 2, ECF No. 33-4.

On June 5, 2020, an incident occurred at CCC during which tensions boiled over between Parsons and the administrative staff.  That morning, a credit application needed to be prepared.

At the end of the day, however, Parsons learned that the task had been passed around the office and ultimately no one completed the credit application. As a result, Parson called a meeting with Hunt, Smith, and Shawn Gardini, the Vice President of CCC. At this meeting, Parsons expressed dissatisfaction with Plaintiffs' failure to complete the task. Hunt responded by asserting that Plaintiffs needed more defined roles.

On June 10, 2020, in response to the June 5, 2020 incident, CCC held a meeting to address various employee concerns. Present at the meeting were Parsons, Gardini, Hunt, Smith, Adams, and Joanne Galton, another administrative assistant at CCC. Hunt asked that the meeting be recorded, but Parsons refused, so Gardini took notes. During the meeting, Plaintiffs raised their concerns about sexual harassment and sex discrimination at CCC, including complaints about sexual comments, the lack of formal job titles, the inability of women employees to communicate with each other during the workday, exclusion from the company photograph, and the heightened scrutiny of leave requests. In particular, Hunt stated that she had been subjected to comments about her appearance that she perceived to be illegal. Similarly, Smith stated that there was "inequality toward the women" and "discrimination" at CCC, and that she felt that she was being "discriminated against." 6/10/20 Meeting Minutes at 2, Pls.' Mot. Summ. J. Ex. 7, ECF No. 33-9. According to Plaintiffs, Parsons responded by asking them, "If you are so miserable why are you still working here?", *id.* at 3, and stating that "things would not change." Pls.' Answers to Interrogatories at 8.

At the June 10, 2020 meeting, Hunt requested that she be given the title of "Operations Administrator" and that Smith be given the title of "Project Manager Administrator." Defs.' Answers to Interrogatories at 9, Pls.' Mot. Summ. J. Ex. 6, ECF No. 33-8. Parsons agreed to this request.

7

According to Hunt, on June 14, 2020, Parson said to her that she did not want Hunt to "come into her office" or to see her "ever again." Hunt Dep. at 43–44. On June 15, 2020, Parsons drafted a memorandum that outlined new policies and guidelines applicable to the administrative staff. In drafting the memorandum, Parsons decided not to implement the job titles to which she had previously agreed. In addition to noting the rescission of the formal job titles, the memorandum described new policies applicable to administrative assistants, including the implementation of timecards, a prohibition on the use of headphones, and a rule that administrative assistants were no longer permitted to make up time off by working during lunch or after hours without prior approval. On June 15, 2020, Parsons sent the memorandum to the administrative staff.

The same day, Parsons and Gardini met with Hunt and Smith separately. During the meeting with Smith, Parsons explained the new policies, including that Smith would no longer have her new job title. Smith was upset with that decision. Parsons also asked Smith if she wanted to resign, and Smith stated that she did not.

During the meeting with Hunt, Hunt requested that the meeting be recorded. When Parsons rejected that request, Hunt stated that she would not participate in the meeting if it was not recorded. Hunt asked Parsons whether her employment was being terminated, and Parsons stated that it was not. Parsons has stated that she decided to terminate Hunt's employment after the meeting.

The next day, on June 16, 2020, Parsons informed Hunt that her employment was being terminated. The same day, upon learning that Hunt had been fired, Smith resigned from CCC.

On June 17, 2020, Plaintiffs filed the original Complaint in the present case. In the Amended Complaint, Plaintiffs allege the following claims: in Counts 1, 2, and 3, claims of unpaid

overtime compensation, in violation of the FLSA, MWHL, and MWPCL, respectively; in Count 4, sex discrimination based on disparate treatment, in violation of Title VII; in Count 5, sex discrimination based on a hostile work environment, in violation of Title VII; and in Count 6, unlawful retaliation, in violation of Title VII.

## DISCUSSION

In their Motion for Summary Judgment, Plaintiffs seek summary judgment in their favor on their claims under the FLSA, MWHL, and MWPCL as to liability, but not damages, and partial summary judgment in their favor on their retaliation claims, only as to the elements of protected activity and a materially adverse action. In their Cross Motion for Summary Judgment, Defendants seek summary judgment in their favor on all of Plaintiffs' claims.

## I.    Legal Standard

Under Rule 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment

as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.    Overtime Claims

Plaintiffs seek summary judgment on liability, and Defendants seek summary judgment in full, as to the overtime claims under the FLSA, MWHL, and MWPCL. Under the FLSA, no employer shall "employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a). There is no dispute that CCC is "an enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA. *Id.* Thus, to prevail on a FLSA overtime claim, Plaintiffs must establish that: (1) they were employed by Defendants; (2) they worked overtime hours for which they were not properly compensated; and (3) Defendants had knowledge of the hours worked. *See Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986); *Bailey v. Cnty. of Georgetown*, 94 F.3d 152, 157 (4th Cir. 1996).

The MWHL requires that employers "pay an overtime wage of at least 1.5 times the usual hourly wage." Md. Code Ann., Labor & Empl. § 3–415(a). The requirements under the MWHL mirror those of the federal law. *McFeeley v. Jackson Street Ent., LLC*, 47 F. Supp. 3d 260, 267 n.6 (D. Md. 2014).

Pursuant to the MWPCL, an employer is required to pay its employees at least once in every two weeks or twice in each month. Md. Code Ann., Lab. & Empl. § 3–502. Employees not paid their wages on time may bring a civil action against the employer to recover the unpaid wages,

including unpaid overtime pay. *Id.* § 3–507.2; *Peters v. Early Healthcare Giver, Inc.,* 97 A.3d 621, 625–26 (Md. 2014). As with the MWHL, an overtime claim under the MWPCL has the same elements as an FLSA claim. *Fiallos v. Hamzah Slaughter House, LLC*, No. JMC-20-3577, 2022 WL 111165, at *2 (D. Md. Jan. 11, 2022). Accordingly, Plaintiffs' overtime claims under the FLSA, MWHL, and MWPCL can be analyzed together under the FLSA standards.

As to the first element, the parties do not dispute that Plaintiffs were employed by Defendants within the meaning of the FLSA.

As to the second element, both parties have established genuine issues of material fact on the question of whether Plaintiffs worked overtime hours. Defendants argue that Plaintiffs' overtime claims fail because they are relying primarily on their oral assertions that they worked more than 40 hours per week and lack documents or other evidence definitively proving that they worked such hours. Under the FLSA, however, it is the employer, not the employee, who has the duty to keep proper records of wages and hours worked. 29 U.S.C. § 211(c); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). Here, it is undisputed that CCC did not use timecards at the time that Plaintiffs worked there, and although CCC may have used Adams's calendar as an informal system to track when employees arrived late, left early, or took medical or vacation leave, they had no system or records tracking when employees arrived early or stayed late. When an employer fails to maintain accurate pay records, "the solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Anderson*, 328 U.S. at 687. Rather, in the absence of employer records establishing the hours worked, an employee may establish overtime pay by providing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* Upon such a showing, the burden shifts to the employer to present evidence of the

11

exact number of hours worked or "evidence to negat[e] the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687–88.

Accordingly, the Court can and will consider Plaintiffs' deposition testimony and the other circumstantial evidence presented on the issue of the number of hours worked. *See id.* at 687. Hunt has testified that she worked, on average, 51.5 hours per week, commonly came in 15 minutes early, and regularly stayed late, sometimes until 9:30 or 9:40 p.m. Smith has testified that she worked, on average, 47 hours per week, and that she regularly stayed at work between 30 minutes and several hours after 5:00 p.m. In partial corroboration of this testimony, Plaintiffs have submitted photographs of themselves at the office after 5:00 p.m., including a photograph of both Plaintiffs in the office taken at 6:55 p.m. They have also submitted work-related emails that they sent after 5:00 p.m., including emails sent by Hunt as late as 9:15 p.m. and emails sent by Smith as late as 10:05 p.m. Plaintiffs also had remote access to the company network and their company emails, such that they could work from home in the evenings.

Defendants' claim that this evidence is insufficient to create a genuine issue of material fact on whether they worked overtime hours is unpersuasive. Under *Anderson*, in the face of incomplete employment records, Plaintiffs need only establish the amount of work performed "as a matter of just and reasonable inference," and the resulting calculation of damages may "be only approximate." *Id.* The United States Court of Appeals for the Fourth Circuit has therefore accepted oral estimates of hours as evidence of the fact that a plaintiff worked overtime hours. *Wirtz v. Durham Sandwich Co.*, 367 F.2d 810, 812 (4th Cir. 1966) (finding that the district court did not err in relying only on the plaintiff's testimony in determining that he had worked uncompensated overtime hours); *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 107–08, 109 (4th Cir. 1988) (finding that plaintiffs' estimates of their overtime, summarized by exhibits, were sufficient

to estimate plaintiffs' uncompensated overtime hours); *Marroquin v. Canales*, 505 F. Supp. 2d 283, 297 (D. Md. 2007) ("[E]mployees have the initial burden of proving they worked a certain numbers of hours, which can be proved 'through an employee's testimony giving his recollection of hours worked.'" (quoting *Turner v. Hum. Genome Sci., Inc.*, 292 F. Supp. 2d 738, 748 (D. Md. 2003))).

Defendants' reliance on out-of-circuit cases such as *Viet v. Le*, 951 F.3d 818 (6th Cir. 2020), and *Holaway v. Stratasys*, 771 F.3d 1057 (8th Cir. 2014), is therefore misplaced. Moreover, in *Viet*, unlike in the present case, the plaintiff failed to provide any documentary evidence, including emails that he said would corroborate his account but that he never presented. *Viet*, 951 F.3d at 825–26. Indeed, in *Viet*, the court acknowledged that to demonstrate having worked overtime hours, plaintiffs "need not recall their schedules with perfect accuracy" and instead need only "coherently describe[] their day-to-day work schedules or the time it takes to complete their duties." *Id.* at 826. Plaintiffs have done so here. In *Holaway*, the plaintiff provided only "vague testimony," without any corroborating evidence such as the emails and photographs presented in this case. *Holaway*, 771 F.3d at 1060. The Court therefore concludes that Plaintiffs' evidence is sufficient to support a finding that Plaintiffs worked some overtime hours.

At the same time, the Court cannot conclude that Plaintiffs are entitled to summary judgment on the overtime claims as to liability. Parsons has testified that Plaintiffs never worked more than 40 hours per week. She asserts that, on the occasions that Hunt stayed at the office later than 5:00 p.m., she was either engaging in personal conversations with co-workers or making up time missed due to arriving late that same day. Where the parties have submitted conflicting evidence on whether Plaintiffs worked overtime hours, the Court finds that there is a genuine issue of material fact that precludes summary judgment in Plaintiffs' favor.

Both parties also seek summary judgment in their favor on the specific issue of whether Plaintiffs' lunch breaks should be excluded from their total hours worked. Having concluded that it will not grant summary judgment on the overtime claims, the Court is disinclined to engage in the process of granting summary judgment on specific subissues relevant to those claims. Nevertheless, even if it did so, it would not grant summary judgment. Time spent taking breaks, including designated lunch periods, is excluded from hours worked for purposes of the FLSA only if the employees use the time predominantly for their own benefit rather than predominantly for their employer's benefit. *Roy v. Cnty. of Lexington*, 141 F.3d 533, 544 (4th Cir. 1998). Plaintiffs have stated that they regularly worked through their lunch breaks, answering the telephone, submitting drawings and permits, receiving mail and packages, and greeting visitors. In contrast, Parsons has testified that all CCC employees were permitted to leave during their lunch breaks. She also testified that she tries to ask employees not to work during lunch breaks, which supports the conclusion that Plaintiffs were not required to work during lunch. Moreover, Plaintiffs acknowledged that they were free to take their break at any time between 11:00 a.m. and 1:00 p.m. and thus stagger their lunch breaks in order to be fully relieved from their duties. Based on the conflicting record evidence, the Court finds that there are genuine issues of material fact relevant to the determination of whether Plaintiffs' lunch time is excludable under the relevant legal standard that preclude summary judgment in favor of either side on this issue at this time.

As for the third element, whether Defendants had knowledge that Plaintiffs worked overtime hours, Plaintiffs have asserted that Defendants supervised Plaintiffs, assigned their work, and supervised all aspects of their performance, such that they presumably would have been aware of their hours worked. Significantly, Parsons acknowledged that she saw Hunt stay at work later than 5:00 p.m., though she denies that this time constituted overtime. The Court finds that the

question of whether Defendants knew about the overtime hours worked is a factual question for the jury.

Accordingly, both Motions will be denied as to the FLSA, MWHL, and MWPCL overtime claims in Counts 1, 2, and 3.

## III.    Title VII Claims

Defendants seek summary judgment on all of Plaintiffs' Title VII claims, which include claims for sex discrimination based on disparate treatment, sex discrimination based on a hostile work environment, and unlawful retaliation.

### A.    Disparate Treatment

Defendants seek summary judgment in their favor on Plaintiffs' claims of sex discrimination based on disparate treatment. A sex discrimination claim may be established through one of two methods. The plaintiff may either demonstrate through direct or circumstantial evidence that discrimination motivated an adverse employment action, or the plaintiff may proceed through the approach espoused in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–04 (1973), under which the plaintiff must establish a *prima facie* case of discrimination; upon such a showing, the defendant must providence evidence of a legitimate, nondiscriminatory reason for the action; and if such evidence is presented, the plaintiff must demonstrate that the articulated reason was actually a pretext for discrimination. *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). To establish a *prima facie* case of sex discrimination based on disparate treatment, a plaintiff must present facts demonstrating:  (1) the plaintiff's membership in a protected class; (2) the plaintiff's satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment or that other circumstances support an inference of

discrimination. *White v. BFI Waste Svcs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004); *see also Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994). The parties do not dispute that Plaintiffs, as women, are members of a protected class. *See Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994). The parties also do not seriously dispute that Plaintiffs' job performance was generally satisfactory.

Defendants primarily argue that none of the alleged disparate treatment imposed an adverse employment action on Plaintiffs. An adverse employment action for purposes of a discrimination claim is one which adversely affects the "terms, conditions, or benefits" of employment. *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). Such adverse actions could take the form of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). Thus, Plaintiffs' claims that they were excluded from the company photograph and from various social events such as company lunch outings cannot support a disparate treatment claim because they did not affect such terms, benefits, or conditions of employment. *See James*, 368 F.3d at 375; *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 542 (D. Md. 2013) (finding that the exclusion of the plaintiff from a group photograph at work, while insensitive, did not constitute an adverse employment action).

Similarly, while Plaintiffs claim that they were subjected to harsher discipline than male colleagues, the discipline at issue consisted of verbal reprimands for arriving late, listening to music, or humming, not discipline in the form of suspensions without pay, demotions, or other forms of discipline that affected Plaintiffs' pay or opportunities for promotion and thus did not result in an adverse employment action. *See James*, 368 F.3d at 375; *cf. Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 429 (4th Cir. 2015) (finding in a retaliation case under the Family

16

and Medical Leave Act that written and verbal reprimands did not constitute adverse employment actions because they did not lead to further discipline).  Plaintiffs have also failed to demonstrate how the fact that they were not permitted to use their job titles as administrative assistants in discussions with CCC clients adversely affected the terms, conditions, or benefits of their employment.  As for Plaintiffs' assertions that they were subjected to heightened scrutiny with respect to leave requests, they have claimed only that their requests required more documentation, that approval took significantly longer, and that confidential medical information relating to medical leave requests was disclosed to others, not that leave requests were not approved or that they had to take unpaid leave.  Where any such disparate treatment did not impact Plaintiffs' pay or ability to use accrued leave, this conduct also does not constitute an adverse employment action.

Finally, Plaintiffs assert for the first time in their brief in opposition to Defendants' Motion that they were subjected to disparate treatment when they were "demot[ed]" from their new titles and were subjected to "more rigid leave policies that would reduce their earning capacity," which may be a reference to the new policy that they were not permitted to make up missed work hours. Pls.' Reply at 6, ECF No. 35.  Where Plaintiffs did not include these allegations as part of the disparate treatment claims in the Amended Complaint, the Court will not consider this conduct as part of Plaintiffs' disparate treatment claims. *See Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).  Moreover, since these incidents occurred at the very end of their employment, after Plaintiffs complained of discrimination, they are more properly considered in relation to Plaintiffs' retaliation claims. *See infra* part III.C.  Thus, the Court will grant Defendants' Cross Motion for Summary Judgment as to Plaintiffs' sex discrimination claim based on disparate treatment.

###   B.     Hostile Work Environment

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome conduct; (2) the conduct was based on the Plaintiffs' race, color, national origin, religion, age, or sex; (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baqir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006).

Three of these elements are not in dispute. The parties do not dispute that Plaintiffs have provided sufficient evidence of unwelcome conduct, including comments about Plaintiffs' dress, weight, and appearance; comments about Hunt's breasts; references to alleged sexual relationships with male co-workers; and derogatory remarks about victims of sexual abuse. The parties also do not seriously dispute that the conduct was based on sex. *See EEOC v. R&R Ventures*, 244 F.3d 334, 338–39 (4th Cir. 2001) (rejecting the argument that a supervisor's harassment was not based on sex where he inquired about the size of the plaintiffs' pants, breasts, and buttocks); *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 302–03 (4th Cir. 2019) (holding that, where an employer allegedly spread a rumor about a female plaintiff having a sexual relationship with a male co-worker, such unwelcome conduct was based on sex). Further, there is no serious dispute that there is basis for imposing liability on Defendants. If the harasser is a supervisor, the employer is either strictly or vicariously liable for the supervisor's actions. *Strothers v. City of Laurel*, 895

18

F.3d 317, 333 (4th Cir. 2018).  Here, the comments in question were largely made by Parsons, Plaintiffs' supervisor, so there is a basis for imputing liability to Defendants.  *Id.*

Defendants primarily argue that that the conduct in question is not sufficiently severe or pervasive to support a hostile work environment claim under Title VII.  To be sufficiently severe or pervasive, the conduct must have altered the conditions of employment and created an abusive or hostile atmosphere.  *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009).  This element has both subjective and objective components.  *Id.*  As to the subjective component, the plaintiff must have subjectively perceived the environment to be hostile or abusive.  *Id.*  Here, Plaintiffs alerted Defendants to the harassment and how it was affecting their work.  Thus, Plaintiffs have satisfied the subjective element.  *See id.* at 176 (finding that a Plaintiffs' emotional distress and complaints to supervisors met the subjective component).  In assessing whether the environment "was objectively severe or pervasive," courts "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)); *see also Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010).  No "single factor is dispositive" because the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships."  *Cent. Wholesalers, Inc.*, 573 F.3d at 176 (internal citations omitted).

Here, Plaintiffs have testified that Parsons made regular and routine comments about their weight, dress, and bodies, including commenting on their breast size and their manner of dress as too revealing, and on one occasion, after Hunt returned from maternity leave, prodding her stomach and stating that she was still "chubby."  Hunt Dep. at 26, 122, 123–24.  *See R&R Ventures,*

19

244 F.3d at 340 (finding that the plaintiff had alleged sufficiently severe or pervasive conduct based in part on regular statements by her supervisor about her breasts and buttocks). Parson also made statements expressing the view that female victims of sexual assault were "asking for it" and "got what they deserved" if they dressed a certain way. Hunt Dep. at 128–30. *See Mosby-Grant*, 630 F.3d at 334 (finding that denigrating the female victims of domestic violence was part of a hostile work environment). Particularly problematic were Parsons's regular comments speculating on whether Hunt and other female employees were having sexual relationships with specifically identified male co-workers. Such spreading of rumors about a woman having a workplace sexual relationship are particularly severe and can support a claim of a hostile work environment based on sex. *See Parker*, 915 F.3d at 303.

Defendants argue based on certain case law, some of which dates back over 20 years, that all of this conduct constitutes "simple teasing, offhand comments, and isolated incidents" and is thus insufficiently severe or pervasive to establish a hostile work environment. *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998); *see, e.g., Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997); *Naylor v. City of Bowie*, 78 F. Supp. 2d 469, 477 (D. Md. 1999). None of the cited cases, however, include the spreading of rumors of sexual relationships with male co-workers, conduct which more recent case law has found to be a basis for a hostile work environment claim. *See Parker*, 915 F.3d at 304–05 (holding that harassment centered on the spreading of a rumor that the female plaintiff had engaged in a sexual relationship with a male employee constituted severe or pervasive conduct sufficient to alter the conditions of employment). When that severe conduct is combined with the other repeated comments about Plaintiffs' bodies and appearance and derogatory statements about victims of sexual abuse, and considered alongside the evidence that women were otherwise treated less favorably and excluded from certain company activities, the

Court finds that there is a genuine issue of material fact on whether the conduct was sufficiently severe and pervasive to establish a hostile work environment.

## C.    Retaliation

Defendants also seek summary judgment in their favor on Plaintiffs' retaliation claim, Title VII bars employers from taking a materially adverse action against an employee in retaliation for opposing an unlawful employment practice covered under the statute, such as for making a complaint of sex discrimination. *See* 42 U.S.C. § 2000e-2(a).   To prove a claim of unlawful retaliation, a plaintiff must demonstrate that (1) the plaintiff engaged in "protected activity," such as a complaint of discrimination; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a "causal connection between the protected activity and the adverse action." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018).  If these elements of a *prima facie* case are established, the employer must produce evidence of a legitimate, non-retaliatory reason for the materially adverse action. *Laber v. Harvey*, 438 F.3d 404, 431 (4th Cir. 2006) (applying the *McDonnell Douglas* framework to a retaliation claim).  If this requirement is met, the plaintiff must then show that the employer's reason was pretextual in that it was false and that retaliation was the real reason. *Id.*  Plaintiffs seek summary judgment in their favor on the first two elements of their retaliation claim, protected activity and materially adverse action.  As with the overtime claims, the Court will consider arguments for summary judgment only as to full claims, not as to individual elements or specific facts.

### 1.    *Prima Facie* Case

The first element of a *prima facie* case of retaliation is protected activity.  As relevant here, an employer may not retaliate against an employee for opposing discriminatory practices in the workplace that would violate Title VII.  *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d

253, 259 (4th Cir. 1998). "To qualify as oppositional activity, an employee need not engage in the formal process of adjudicating a discrimination claim." *Id.* "Oppositional activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id.* In particular, employees engage in protected oppositional activity when they complain to their superiors about suspected violations of Title VII. *Boyer-Liberto*, 786 F.3d at 281. Even if the conduct does not actually constitute unlawful discrimination, plaintiffs have engaged in protected oppositional activity if they complain about practices that they reasonably believed to be unlawful discrimination under Title VII. *Id.* at 282.

Here, Plaintiffs have put forth evidence that during their June 10, 2020 meeting with Parsons and other CCC employees, they raised various concerns about workplace discrimination. As reflected in the formal notes of the meeting taken by Gardini, Hunt requested that unprofessional comments about appearance stop, stated that she had been offended by such comments, and that she considered such comments to be "illegal." 6/10/20 Meeting Minutes at 1. At the same meeting, Smith stated that there was "inequality toward women" and "discrimination" at CCC, as well as that she felt that she was being "discriminated against." *Id.* at 2. When combined with the facts underlying Plaintiffs' disparate treatment and hostile work environment claims, the Court finds that this evidence is sufficient to show that Plaintiffs reasonably believed that they were subjected to unlawful discrimination and complained to their supervisor about it. *See Boyer-Liberto*, 786 F.3d at 282; *Strothers*, 895 F.3d at 328 (finding that a plaintiff's complaints to her supervisor constituted protected activity where she had a reasonable belief that the complained of conduct violated Title VII). Accordingly, the Court finds, at a minimum, that there is a genuine issue of material fact on whether Plaintiffs engaged in protected activity.

On the second element, a "materially adverse" action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). An action taken against a plaintiff may be "materially adverse" even if it did not result in a loss of compensation, job title, level of responsibility, or opportunity for promotion. *Id.* at 67 (rejecting the standard limiting actionable retaliation to "so-called ultimate employment decisions"). Where CCC terminated Hunt's employment, there can be no dispute that she was subjected to a materially adverse action. *Strothers*, 895 F.3d at 328 (finding that it is "patently obvious and undisputed" that termination is a materially adverse action). As for Smith, Plaintiffs also allege that CCC took materially adverse actions when, in the memorandum issued by Parsons on June 15, 2020, it (1) ceased permitting Plaintiffs to use earbuds at work; (2) stripped Hunt and Smith of their newly agreed to titles of "Operations Administrator" and "Project Manager Administrator," respectively; and (3) ceased permitting Plaintiffs to make up their missed work hours without prior approval. Although the Court does not find that the prohibition of earbuds constitutes materially adverse action, the change in policy to bar administrative staff, including Smith, from making up missed work hours by staying late could impact the actual wages received in particular weeks and therefore would constitute materially adverse actions that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68; *Boone*, 178 F.3d at 255 (finding that a decrease in pay or benefits could support of a retaliation claim). Thus, there is sufficient evidence to show that both Plaintiffs were subjected to a materially adverse action after complaining of discrimination.

Finally, as to the third element, causation in a retaliation claim can be inferred based on the temporal proximity between the protected activity and the retaliatory action. *See King v. Rumsfeld*,

328 F.3d 145, 151 & n.5 (4th Cir. 2003) (concluding that ten weeks between the protected activity and the materially adverse action gave "rise to a sufficient inference of causation to satisfy the prima facie requirement"). Here, Plaintiffs complained about discrimination on June 10, 2020, and five days later, on June 15, 2020, CCC instituted a new policy prohibiting them from making up missed hours. Hunt was terminated on June 16, 2020, only six days after the protected activity. Given the close temporary proximity between the protected activity and the materially adverse actions, there is sufficient evidence to establish the causation element. *See id.*

### 2.   Legitimate, Non-Retaliatory Reason

When a plaintiff has provided sufficient evidence to demonstrate a *prima facie* case, the next step in the *McDonnell Douglas* analysis is that the defendant has a burden of production to put forth evidence of a legitimate, non-retaliatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 803. Here, Parsons has stated that she decided to terminate Hunt's employment because she refused to attend a meeting on June 15, 2020 unless Parsons consented to the recording of that meeting. The Court finds that this deposition testimony meets the requirement of producing evidence of a legitimate, non-retaliatory reason for terminating Hunt's employment. Notably, Defendants advance no specific non-retaliatory reason for changing the policy to bar administrative staff from making up missed work hours.

### 3.   Pretext

Upon a showing of a legitimate, non-retaliatory reason for a challenged employment action, a plaintiff must demonstrate that the articulated reason was not the true reason for her demotion but instead was a pretext for retaliation. *See Laber*, 438 F.3d at 411. At this point, the Plaintiffs' burden to demonstrate pretext has merged with the ultimate burden to prove that the plaintiff has been the victim of retaliation. *Stokes v. Va. Dep't of Corrections*, 512 F. App'x 281,

282 (4th Cir. 2013). Accordingly, to satisfy the pretext requirement, a plaintiff must show both that the reason was false and that retaliation was the real reason. *Foster v. Univ. of Md. Eastern Shore*, 787 F.3d 243, 252 (4th Cir. 2015). "In order to show pretext, a plaintiff may show that an employer's proffered non-[retaliatory] reasons . . . are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) (addressing Title VII discrimination).

Here, Hunt asserts that Defendants' proffered reason for terminating her employment, her refusal to participate in the June 15, 2020 meeting because it would not be recorded, is pretextual. Specifically, Hunt argues that on June 14, 2020, Parsons had already made the decision to terminate her employment, as reflected by her statement that day that she did not want to see Hunt "ever again." Hunt Dep. at 43–44. In contrast, Parsons has testified that when Hunt specifically asked during the June 15, 2020 meeting if her employment was being terminated at that time, Parsons said that it was not, and she has further asserted that she did not decide to terminate Hunt's employment until later that evening. On this record, the Court finds that there remains a genuine issue of material fact as to whether the proffered reason for the termination of Hunt's employment was pretextual. Thus, both Motions will be denied as to the retaliation claims.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment on the FLSA, MWHL, and MWPCL claims as to liability, and the first two elements of the retaliation claims, will be DENIED.  Defendants' Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART in that it will be granted as to the claims in Count 4 of sex discrimination based on disparate treatment and will be otherwise denied.  A separate Order shall issue.

Date:  March 31, 2023

THEODORE D. CHUANG
United States District Judge

26